William E. **BURRESS**, Sr. and Reba J. Burress, and the Peoples Bank and Trust Company of Booneville, Mississippi, Plaintiffs,

v.

**STANDARD FIRE INSURANCE COMPANY, Defendant.**

**No. EC82–329–LS–D.**

United States District Court,
N.D. Mississippi.

Jan. 15, 1986.

William Smith, Rickey T. Moore, Booneville, for plaintiffs.

Richard T. Lawrence, Jackson, for defendant.

## MEMORANDUM OPINION GRANTING JUDGMENT IN FAVOR OF DEFENDANT

SENTER, Chief Judge.

In this diversity action which was removed to federal court, Plaintiffs William E. Burress, Sr., and Reba J. Burress, husband and wife, sued Defendant Standard Fire Insurance Company for recovery of policy proceeds following a fire loss on October 28, 1981, to a building and contents owned by plaintiffs in Booneville, Mississippi. Plaintiffs seek recovery of $27,680.38 for the contents and $40,000.00, the face amount of the policy, for the building. The defendant is defending the action on the grounds of arson, misrepresentation, concealment, and increased hazard. Sitting without a jury, the court conducted an evidentiary hearing on October 15–16, 1985. Pursuant to Fed.R.Civ.P. 52(a), the court finds as follows.

## I. FINDINGS OF FACT.

The Burresses purchased the House of Carpets, a retail carpet business, in February, 1981, from a Mr. Wren. Since they had never before been in the retail carpet business, they retained the employees who had worked for Wren. The Burresses assumed a loan which had an outstanding balance of approximately $62,000 and payments which were in arrears in the amount of $3,300. An insurance policy was purchased which was in effect from March 3, 1981, until March 3, 1984, and had coverage limits of $40,000 on the building and $60,000 on the personal property.[1] The lot fronted Highway 45 within the city limits, and the building sat 100–150 feet from the highway. The metal structure contained an office/showroom about 20' × 24' in area and a warehouse about 40' × 80' in area. The business was operating at a loss when purchased by the plaintiffs, and it remained unprofitable. Plaintiffs conducted a "going-out-of-business" sale in September and October of 1981, allegedly to provide more time and service to Mr. Burress' ill father. This sale was still in effect on the day of the fire.

On Wednesday, October 28, 1981, at approximately 4:00 a.m., the House of Carpets became consumed in flames and was destroyed by fire. The fire was incendiary in origin, or deliberately set, and resulted when flammable liquids deliberately placed inside the building's warehouse area ignited. According to plaintiffs, they were at home with their sons the evening before the fire and were asleep when they received a telephone call at approximately 4:00 a.m. in which the caller informed them that their business was on fire. They left the house immediately and arrived at the fire scene a few minutes later. A fire truck was already on the scene, and Mr. Burress assisted the firefighters by unlocking the front door to the building. The building was a total loss, and substantial damage was done to the rolls of carpet, a forklift, and a truck.[2] Mr. Burress subsequently completed and filed a sworn proof of loss form and nonwaiver agreement with the insurer's representative.[3] On April 19, 1982, plaintiffs were notified that the insurer denied any and all liability arising from the October 28 fire. Plaintiffs thereafter

---

1. The policy contained an 80% coinsurance clause, which means that the insurer believes that the coverage limits—$40,000 and $60,000, here—would constitute 80% of the cost of replacing the business. Although the underwriter initially questioned these figures as being inadequate, the local agent, James Robert Floyd, thought the coverage adequate.

2. The insurance policies covering the forklift and the truck were independent of the policy at issue here. At the time of trial, proceeds on the truck had been paid, but proceeds on the forklift had not been paid. The truck had a salvage value of $1,500.

3. According to Joanna Rice, senior claims representative for Aetna Insurance Company, of which Standard Fire Insurance Company is a subsidiary, a nonwaiver agreement states that the insurer does not waive its right to deny the claim until further investigation.

initiated this lawsuit to recover the proceeds of the policy.

Mr. Burress asserted that he closed the business for the day at 5:30 p.m. the evening before the fire. The building had three entrances. The front glass door led into the showroom and office areas and contained a deadbolt lock which required a key to be unlocked from either the inside or the outside. The warehouse portion of the building contained a large overhead door which had a sliding lock and which could be opened or unlocked only from the inside. The rear entrance to the warehouse area contained a lock that one had to push in to lock and which could be opened from the inside without a key. After the Burresses had purchased the business in February, 1981, they had the locks on the building changed. Mr. Burress affirmed in his testimony that he was convinced that the locks were secure enough to keep out intruders.[4] Although Mr. Burress stated that other persons had had keys to the building, he admitted that all the keys were returned to him before the day of the fire. On the evening before the fire, Mr. Burress made certain that he locked all the doors and entrances before he left, and he did not see, hear, or smell anything unusual. He testified at trial that he knew of no threats against him or of any previous break-ins or of anyone who would have a motive to set the fire.

Frank Fleming, Booneville fire chief, was at the scene of the fire when the fire department arrived. At trial, he testified that he went around to the south side of the building that morning and found no evidence of illegal entry. He attempted entry through the front showroom door, but found it locked. Fleming examined the back door of the building and found it locked and unopenable from the outside. He then unsuccessfully attempted entry through the overhead warehouse door, which he finally broke open by use of an ax. Upon gaining entrance, Fleming smelled gasoline in the area of the warehouse where the carpet was stored. He took pictures and samples but did not question anyone. An examination of the truck in the warehouse revealed that the fuel line had been cut evenly. Fleming thereafter contacted the state fire marshal's office.

Max Ellis, a deputy state fire marshal, investigated the fire scene on November 4.[5] His investigation revealed that an accelerant had been poured on the carpet and set aflame. The remnants of the rolls of carpet showed distinct lines and places of burns. His examination also revealed no evidence of forced entry into the building. In a discussion with Mr. Burress, Ellis discovered that business had been slow and that Burress was having to lay off some of his employees. Ellis was of the opinion that a key had to be used to enter the building and that the fire was incendiary, although he admitted that there was no direct evidence as to who set the fire.

Kirk McDaniel is manager of Aetna's arson and fraud unit and, in that capacity, supervises investigators for the southeast part of the country.[6] His November 2 investigation revealed that no one had gained entrance through the front glass and that there was no real disturbance or evidence of vandalism in the office/showroom part of the building. He found the origin of the fire to be flammable liquids placed in a

4. There is conflicting testimony about the secureness of the rear entrance. At trial, Mr. Burress testified that on one occasion, he had arrived at work to find a contractor's crew installing a fan in the warehouse and that they had gained entrance through the rear door. In a deposition taken prior to trial, however, he stated that he knew of no occasion wherein anyone had gained entrance through the locked doors. Depos., p. 80. The court finds the testimony in the deposition more credible than the testimony at trial.

5. Ellis' investigative experience includes being a sheriff for eight years, being a member of the Governor's Highway Safety Program, attending the National Fire Academy and several training schools, and investigating 400–450 fires.

6. McDaniel's expertise derives from 200 hours of classroom training, attendance at seminars and schools, training of fire marshals and investigators, and membership in several professional associations. He is an expert in the cause and origin of fires.

corner of the warehouse, and he thought the fuel had come from the truck, the filler hose of which had been cleanly cut. The evidence indicated to McDaniel sporadic burning and particular placement of flammable liquids on the carpet. McDaniel pointed out that carpeting does not support its own burning. There was no evidence of tampering with the locks, according to McDaniel. He testified that there was no evidence that this fire was caused by vandals. He pointed to the fact that there was no damage to the drink machines or to the truck, other than fire damage. Typically, vandals do not set fires solely to have a fire going. McDaniel also discarded a burglary theory and a revenge theory of the fire since the drink machines remained intact and since revenge fires are usually made against the outside of the building. This fire, McDaniel pointed out, was started to damage the carpet, not the building. The witness testified that there were no signs of forcible entry and that the type of lock on the back door indicated that the building was secure. More specifically, he testified that use of a credit card would not permit entrance through the rear door because of the particular design and manufacture of the door and frame. In McDaniel's opinion, the fire was incendiary.

Much of the testimony, and the portion most vigorously disputed, centered around plaintiffs' financial condition at the time of the fire loss. At that time, they had an interest in three apartment complexes: A & B Associates, Ltd., and Greenacres, begun in 1978, and Carter Hill, or Burress Brothers, Ltd., begun in 1977.[7] The first of these were low-income housing projects subsidized by the Department of Housing and Urban Development (HUD).[8] Cost overruns on these projects forced plaintiffs in 1979 to obtain loans totaling over $100,000 from a lender at a time when interest rates were hovering at 20% per annum.

On April 3, 1981, six months prior to the fire, HUD notified Mr. Burress that housing assistance payments had been suspended on these projects due to receipt by plaintiffs of excess payments. The A & B project was approximately $65,000 delinquent in payments, and the Greenacres project was in arrears in the amount of $59,000. One month prior to the date of the fire, the Farmers Home Administration (FHA) notified Mr. Burress of acceleration of the debt to FHA on the A & B and Greenacres projects. Much of plaintiffs' income was derived from these projects, and this cessation of housing assistance payments had an adverse impact upon their financial condition. Insurance on the projects was obtained from Aetna. After the fire at issue here, Aetna cancelled all insurance on the three apartment projects, and plaintiffs were unable to obtain insurance elsewhere. FHA finally agreed to insure the projects at a higher cost. Burress Brothers, Ltd., was sold by plaintiffs in 1983. The debt on that project was assumed, and plaintiffs were paid $65,000.

In May, 1981, the Small Business Administration (SBA) turned down the House of Carpets' application for an $80,000 loan. The reasons listed for rejection were: (a) lack of reasonable assurance of repayment of loan from earnings; (b) gross disproportion between business debt and net worth, and (c) insufficient collateral.

The Burresses have been involved in other business ventures. Mr. Burress was in the real estate business for a short time, but admitted that he sold no real estate in 1980 and only one parcel in 1981. Mr. Burress also owned a retail furniture store jointly with his mother. The value of the business in June, 1981, was estimated to be $225,000, and the debt was about $5,000. The business was sold in 1983 for $175,000.

---

**7.** At the time of the fire, Mr. and Mrs. Burress were general partners in all three projects, each having a 2½% interest. Mr. Burress also paid himself a management fee.

**8.** The plaintiffs obtained interim financing from a local bank and long-term financing from FHA.

Mr. Charles E. Brown, plaintiffs' CPA, explained the way it worked: plaintiffs had to obtain funding; they had to put up 5%, and FHA would guarantee 95%, thereby allowing the partners to calculate depreciation on $525,000 while actually investing only $25,000.

Since the fire in issue, plaintiffs have engaged in a retail dress shop business, which lost $5,000, and a used car business, in which Mr. Burress is still engaged.

Fundamental to an understanding of the dispute about the Burresses' financial condition is distinguishing between one's cash flow and one's adjusted gross income as reported on an income tax return. One of the primary bases for the difference is the existence of depreciation and other noncash outlays on investments. Depreciation may be deducted from income on investments, although there is no cash outlay. This could produce, and often does in financial tax shelters, the anomalous result of a business with a net operating loss, yet a positive cash flow. Another gauge of one's financial position is net worth, i.e., the remainder after deduction of liabilities from assets.

It is undisputed that the House of Carpets had a negative cash flow, a net operating loss, and a negative net worth in 1981. This was explained by Charles E. Brown, plaintiffs' CPA. That business had a loss of $19,000, of which only $5,000 was depreciation, leaving a negative cash flow of $14,000. Although Brown noted that nearly all new businesses experience losses in the first year of operation, the court notes that the House of Carpets was a going concern when purchased by the plaintiffs. Plaintiffs also owed $57,000 on the SBA loan and $38,000 to the bank on the date of the fire, a debt totaling $95,000. The insurance proceeds claimed by plaintiffs in this action totaled approximately $76,000.[9] This would have left plaintiffs owing only $19,000 on the debt on the House of Carpets. Furthermore, if the land was thereafter sold, plaintiffs could pay off the $19,000 debt and retain cash in a business that previously had a negative cash flow, a negative net worth, and operated at a loss. Cecil Brown, a CPA who is a technical call contractor for the SBA, i.e., one who evaluates loans for that agency, testified that

anyone who received insurance proceeds would necessarily be in a more favorable cash flow position. He examined the financial records of the House of Carpets on January 19, 1982, and found consistent overdrafts, some as high as $30,000. He concluded that the business was having cash flow problems and that it was relying on bank overdraft privileges to hide the problem. Cecil Brown was of the opinion that the business was unprofitable and that it could not continue to operate without an infusion of capital. Brown also noted that plaintiffs would have been better off financially after the fire if the insurer had paid the claim.

The Burresses also experienced losses in the apartment projects. Although the financial condition is disputed, the more credible evidence reveals that each of these projects had an insufficient cash flow and could not meet its obligations as they became due. An examination of the financial records showed that the Burresses used SBA funds to repay personal loans.

Additionally, plaintiffs' individual income tax returns for the years 1978 through 1981 show an adjusted gross income (AGI) of $52,000 for 1978, AGI of $36,000 for 1979, a loss of $11,000 for 1980, and a loss of $42,000 for 1981. Although, as explained above, this evidence alone is not determinative of one's financial position, it contributes to the showing that plaintiffs' finances were in poor condition. The Burresses were also forced to borrow $40,000 from their son, $20,000 of which was still owing at the time of the fire.

## II. CONCLUSIONS OF LAW.

This court has jurisdiction over the parties and the subject matter of this controversy pursuant to 28 U.S.C. § 1332.

■ In Mississippi, arson may be established if three elements are present: (1) a fire incendiary in nature; (2) opportunity to commit the incendiary act; and (3) mo-

---

9. This amount is the sum of (a) $40,000 for the building; (b) $27,000 on the contents; (c) $5,700

on the forklift; and (d) $3,400 on the truck.

tive to cause the fire. *See Vicksburg Furniture Mfg., Ltd. v. Aetna Cas. & Sur. Co.*, 625 F.2d 1167, 1171–72 (5th Cir.1980) (interpreting Mississippi law); *Sullivan v. American Motorist Ins. Co.*, 605 F.2d 169, 170 (5th Cir.1979) (same); *Cora Pub., Inc. v. Continental Cas. Co.*, 619 F.2d 482, 485 (5th Cir.1980) (interpreting Florida law and citing cases in other jurisdictions). It is clear that it is sufficient evidence of arson to show the same by a preponderance of the evidence. *Gardner v. Wilkinson*, 643 F.2d 1135, 1137 (5th Cir.1981); *Vicksburg Furniture Mfg.*, 625 F.2d at 1169–70 (preponderance of evidence standard applicable in Mississippi is in accord with that followed in most American jurisdictions). Moreover, circumstantial evidence alone is sufficient to establish the elements essential to an arson defense. *DaLomba v. Audubon Ins. Co.*, No. DC81–148–WK–P, slip op. at 12 (N.D.Miss. Dec. 5, 1983) [Available on WESTLAW, DCTU database], *see, e.g., Gardner*, 643 F.2d at 1136 (insurer presented only circumstantial evidence at trial since there were no witnesses to the setting of the fire, though jury ultimately rendered verdict unfavorable to insurer); *Vicksburg Furniture Mfg.*, 625 F.2d at 1171–72 (affirming jury verdict of corporate arson reached after review of circumstantial evidence similar to evidence in case at bar); *Sullivan*, 605 F.2d at 169–70 (affirming trial court's verdict for insurer after review of circumstantial evidence). The court will address each of the three elements.

A. Incendiary Nature of the Fire.

The evidence in the action *sub judice* overwhelmingly indicates that the October 28 fire was incendiary in nature. Frank Fleming, the Booneville fire chief, testified that he smelled gasoline in the area where the carpet was stored when he was finally able to gain entrance to the building on the morning of the fire. Max Ellis, deputy state fire marshal, formed the opinion after his investigation that the fire was incendiary. It was his belief that an accelerant had been poured on the carpet and set aflame, creating distinct lines and places of burns. He also smelled an accelerant during his investigation on November 4. Kirk McDaniel, manager of Aetna's arson and fraud unit and an expert in the cause and origin of fires, conducted an investigation on November 2 and reached the same conclusion based upon his observance of sporadic burn patterns on the carpet. He was of the opinion that fuel from the truck had been placed on the carpet in heavily concentrated amounts and set aflame, and that the fire was definitely incendiary. It was McDaniel's opinion that the origin of the fire was flammable liquids placed in a corner of the warehouse. He also believed that the fuel line on the truck had been deliberately severed to obtain the flammable liquids used in ignition of the fire. Plaintiffs put on no proof to rebut this evidence.

The court is of the opinion that the October 28 fire was incendiary in nature.

B. Opportunity.

Since the fire was clearly of incendiary origin, it is possible to draw two inferences from the evidence—one, that the plaintiffs caused the fire to fraudulently procure the insurance, and, the other, that they did not. This has presented to the court a factual issue which must be resolved by credibility choices. *DaLomba*, slip op. at 11. It is the duty of the trial court to reconcile the testimony of all the witnesses, if possible, without imputing perjury to any of them; but faced with a plain conflict of testimony, the court is the sole judge of what to accept and what to reject and the credibility of the witnesses. *Williams v. Cambridge Mut. Fire Ins. Co.*, 230 F.2d 293, 296–97 (5th Cir.1956) (upholding trial court's finding that insured intentionally burned her business/dwelling or procured its destruction).

The evidence regarding opportunity clearly indicates that plaintiffs had an opportunity to set the fire in issue. After they bought the business from Mr. Wren, plaintiffs had the locks on all the entrances changed. Although each independent contractor crew had a key to the building, Mr.

Burress testified that all the keys had been returned to him by the date of the fire.

Mr. Burress was the last to leave the building the evening before the fire. In a deposition taken in February, 1982, he stated that he locked all the doors and entrances to the building before he left and made sure each was locked. Depos., pp. 77–78. He also stated that the locks were secure enough to keep out intruders, depos., p. 81, and that he knew of no instances prior to the fire of people coming into the building when the doors were supposed to be locked or at night when he was not there. Depos., p. 80. Although he modified much of this testimony at trial, the court finds the testimony in the deposition more credible. Moreover, the evidence is undisputed that there was no forced entry into the building. Defendant offered unimpeachable evidence that a key was used to gain entrance to the building. The independent investigations of the local fire chief, the deputy state fire marshal, and Aetna's representative all unequivocally showed that no door or metal wall had been pried open, that no glass had been broken to gain entrance, and that there was no evidence of any tampering with any of the three locks. Each of the investigators independently concluded that the person who set the fire had to have had a key to gain entrance to the building. As noted, plaintiffs were the only persons to have keys at the time of the fire. At the time he left the building the evening before the fire, Mr. Burress neither saw, smelled, nor heard anything unusual. He also stated in a deposition that there were no electrical problems with the building and that no flammable liquids were stored in the building at the time of the fire. As noted, investigation of the cause and origin of the fire revealed that the fire was caused by the ignition of flammable liquids inside the building, most likely procured from the fuel line of the truck.

The court is of the opinion that the credible evidence clearly establishes that the plaintiffs herein had sufficient opportunity to cause the October 28 fire.

C. Motive.

This element is the one most vigorously disputed by the parties. Defendant argues that plaintiffs were engaged in an unprofitable business which had a negative cash flow and negative net worth and that they attempted to generate cash flow which had been cut off because of other failing business ventures. Defendant also points to evidence of plaintiffs' deteriorating personal financial condition as evidence of motive to collect the insurance proceeds. Plaintiffs, on the other hand, introduced expert testimony to show that the alleged losses were merely "paper losses" rather than true losses, and that they were solvent and able to pay their debts as they became due.

Mr. Burress testified that he purchased the House of Carpets in February, 1981, and assumed an outstanding indebtedness of $62,000–$63,000 on the business. He admitted that the loan payments were $3,300 in arrears at the time of assumption. Business slowed and the Burresses began to lay off some of their employees. In June, 1981, their application for a small business loan in the amount of $50,000 was rejected. The House of Carpets conducted a "going-out-of-business" sale for the two months immediately preceding the fire. The plaintiffs' CPA testified that the business had a $19,000 operating loss, a $15,000 negative cash flow, and a negative net worth for 1981. The total debt due on the House of Carpets on the date of the fire was $94,000, according to plaintiffs' CPA. This conclusion is in accord with the testimony of Cecil Brown, a CPA who evaluated loans for the SBA and who testified on behalf of the defendant. Based on his own investigation, Brown concluded that the House of Carpets was having cash flow problems that were being obscured by plaintiffs' abuse of the bank overdraft privileges, citing overdrafts as high as $30,000. He also concluded that the business could not have operated profitably with the amount of inventory then in stock and that the business could not have continued to operate without an infusion of capital. Brown was of the opinion that plaintiffs would have been better off after the fire

than before the fire if the insurer had paid the proceeds allegedly due.

Plaintiffs had also been forced to borrow $40,000 from their son, $20,000 of which was still outstanding at the time of the fire loss. As of October 28, they had an outstanding loan of $30,000 with the local bank. Although several monthly installments had been made, no reduction in principal had been accomplished.

Investments in the apartment projects began to deteriorate when HUD discovered cost overruns which forced plaintiffs to obtain loans totaling $100,000 from a lender at a time when interest rates were hovering near 20% per annum. Furthermore, six months prior to the date of the fire, HUD notified Mr. Burress that housing assistance payments had been suspended on two of the projects due to plaintiffs' receipt of excess payments. The projects became delinquent in payments, and, one month prior to the date of the fire, the FHA notified Mr. Burress of acceleration of the debt on two of the projects.

The financial woes in the action *sub judice* are not unlike those experienced by the plaintiffs in *Vicksburg Furniture Mfg.*, *supra.* That action arose out of a fire insurer's refusal to pay for a fire loss. Plaintiff, Vicksburg Furniture Mfg., was insolvent at the time of the fire, its bank account showed an overdraft of nearly $24,000, accounts payable equaled four times the amount of accounts receivable, and the business was experiencing labor difficulties and cash flow problems throughout its existence. The shareholders were forced to loan money to the corporation out of personal accounts, and they personally guaranteed a $22,000 loan to the corporation. 625 F.2d at 1171. The Court of Appeals for the Fifth Circuit concluded that this evidence constituted a strong motive for arson and, when combined with the opportunity to commit the incendiary act, was sufficient to support a finding of arson. *Id.* at 1172.

Similarly, this court is of the opinion that the motive and opportunity to commit the incendiary act are clearly present in this situation and are adequate to support an arson defense. The court is of the opinion that plaintiffs deliberately set, or procured a person or persons to deliberately set, the October 28, 1981, fire which destroyed the House of Carpets in Booneville, Mississippi. Pursuant to the terms of the insurance policy, the defendant has no liability, and plaintiffs are entitled to no recovery from this defendant for this fire. This matter is dismissed with prejudice.

An order in conformance with this opinion shall this day issue.